Death Opinion



 

 




 

 

IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,247




 


JIMMIE URBANO LUCERO, Appellant



v.


 

THE STATE OF TEXAS






ON DIRECT APPEAL

FROM CAUSE NO. 48593-C FROM THE 251ST DISTRICT COURT

POTTER COUNTY




 Hervey, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Womack, Keasler, Holcomb and Cochran, JJ., joined. Price and Johnson, JJ.,
concurred.


O P I N I O N


 Appellant was convicted on May 23, 2005, of murdering three of his neighbors during the
same criminal transaction. Tex. Pen. Code Ann., §19.03(a)(7)(A). (1) Pursuant to the jury's answers
to the special issues set forth in Tex. Code Crim. Proc., Article 37.071, §§2(b) and 2(e), the trial
judge sentenced appellant to death. Finding no merit in any of the seven points of error raised by
appellant in this direct appeal, we affirm. Points of error one and two relate to a juror misconduct claim that appellant raised in a
motion for new trial. Appellant asserts in point of error one that the trial court erred in denying him
a hearing on his juror misconduct claim. (2) He asserts in point of error two that the jury committed
misconduct under the United States Constitution when it considered Biblical scripture during the
punishment-phase deliberations. (3) The record reflects that appellant filed new trial motions (an original and an amended motion
for new trial). These motions alleged that the jury foreman read Biblical scripture to the jury at the
beginning of the punishment-phase deliberations after an initial straw vote showing that two jurors
were unwilling to answer the special issues in a way that required appellant to be sentenced to death. 
These motions alleged:

 After retiring to deliberate on the issue of punishment, the jury foreman conducted
an initial straw vote on both of the statutorily mandated special issues which
addressed the probability that Defendant would commit criminal acts of violence in
the future so as to constitute a continuing threat to society (special issue number 1)
and whether there existed sufficient mitigating circumstances to warrant that a
sentence of life imprisonment rather than a death sentence be imposed (special issue
number 2). This initial vote revealed a majority of ten jurors who were prepared to
vote "yes" to special issue number 1 and "no" to special issue number 2, thus
necessitating the imposition of the death penalty. The remaining two jurors indicated
their unwillingness to vote in such a way in which the death penalty would be
imposed. At this juncture, the jury foreman produced his personal Bible and read to
all members of the jury scripture from the Bible. This scripture addressed a
Christian's duty to obey and consent to the laws of man.[ (4)] It also informed the
listeners that those who opposed authority would experience condemnation.[ (5)]


 The content of this scripture had the desired effect of coercing the two dissenting
jurors to change their votes in order to insure a unanimous tally on both special
issues. Thus, the receipt of the biblical scripture by the jury infringed on each
individual juror's duty to base their verdict only on evidence received at trial. This
receipt of other evidence was detrimental to Defendant's constitutional guarantee that
the verdict at the punishment phase of the trial be truly unanimous, free from
coercion and the product of the juror's individualized assessment of evidence
lawfully admitted into during (sic) the punishment phase of the trial.


 Appellant supported these allegations with an affidavit from one of the jurors (juror No. 7). 
This affidavit states:

 I served as a juror in the case styled The State of Texas v. Jimmie Urban Lucero in
the 251st District Court in Potter County, Texas. During jury deliberations at the
punishment phase of the trial, I recall that the jury foreman suggested that we take a
"straw vote" or a preliminary vote on the two special issues to see where we, as the
jury were. The initial vote on both special issues showed 10 jurors were in favor of
answering the questions in a way in which the death penalty would be imposed. The
remaining two jurors were unwilling to answer those questions in a way in which the
death penalty would be imposed. It was at this point in time that the jury foreman
took out a Bible which he had with him. He read some scripture from the Bible. 
This scripture had to do with a Christian's duty to obey, conform and consent to the
will and laws of man. This reading of scripture occurred before the final votes were
taken by the jury on the two special issues regarding the probability that the
Defendant would commit criminal acts of violence in the future and the sufficiency
of mitigating evidence which would justify a life sentence in place of the death
penalty. Although there was not a unanimous vote by the jury as a whole on the two
special issues before the reading of the scripture, the vote was unanimous on both
special issues some time after the reading of scripture. The foreman of the jury then
informed the bailiff and the Court that we had reached a unanimous verdict which
called for the death penalty against Jimmie Lucero.

 

 Appellant claimed that the Bible reading by the jury foreman was an improper "outside
influence" under Tex. R. Evid. 606(b), which generally prohibits a juror from testifying about jury
deliberations for the purpose of impeaching the jury's verdict with an exception to this general rule
being that a juror may testify "whether any outside influence was improperly brought to bear upon
any juror." (6) Appellant further claimed that it was mandatory for the trial court to hold a hearing on
his new trial motions so that appellant could "develop the circumstances of the Bible reading and
the exact content of the biblical verse read by the foreman to the entire jury." 

 Appellant also claimed in his new trial motions that he was entitled to a hearing on these
motions because "key jurors refuse[d] to discuss the matter with counsel or with any representative
of counsel." He further claimed that "[o]nly through compulsory process and sworn testimony from
key jurors at a hearing can all relevant facts be developed for this Court's ultimate determination of
the merits underlying Defendant's motion." Appellant's counsel filed an affidavit in support of these
allegations. The affidavit indicates that only three jurors (Nos. 1, 8, and 12) declined to discuss the
case with appellant's counsel. It also specifically states counsel did discuss the case with jurors
numbered 2, 3, 4, 5, 6, 7, and 11. No mention is made of juror No. 9 or No. 10. Thus, it appears
nine out of twelve jurors did discuss the case with appellant's counsel before he filed his new trial
motions supported only by juror No. 7's affidavit. 

 Relying primarily on civil cases, the State's response asserted that the Bible reading was not
an "outside influence" and that appellant was, therefore, improperly attempting to impeach the jury's
verdict under Rule 606(b). See, Golden Eagle Archery Inc. v. Jackson, 24 S.W.3d 362, 366-75 (Tex.
2000) (rules contemplate that an "outside influence" originates from sources other than the jurors
themselves); Brandt v. Surber, 194 S.W. 3d 108, 134 (Tex.App.-Corpus Christi 2006, pet. denied)
(a jury's discussion of newspaper articles is not an "outside influence"); Easly v. State, 163 S.W.3d
839, 842 (Tex.App.-Dallas 2005, no pet.) (a chart brought into jury room with calculations of time
appellant would serve in prison after application of the parol laws is not an "outside influence");
Perry v. Safeco Ins. Co., 821 S.W.2d 279, 281 (Tex.App.-Houston [1st Dist.] 1991, writ denied)
(juror using dictionary to share a definition with other jurors is not an "outside influence").

 It is also imperative to note that the State submitted affidavits from all twelve jurors, all of
which indicated that the verdict was not affected by the brief reading of Biblical scripture near the
beginning of the hours-long jury deliberations. The two jurors who changed their votes after the
preliminary vote unequivocally stated that the reading of the scripture and its content had no effect
on their votes on the issues presented to the jury. Juror No. 3 stated: 

 When the first vote was taken, I was not ready to vote because I was
overwhelmed and too emotional. As a result, I initially voted in a way that a life
sentence rather than the death sentence was imposed. The case was difficult for me,
among other reasons, at least because, I, like the defendant, came from a large family,
had a brother about the same age of the defendant, and the defendant's mother was
near the age of my mother. I wanted to take time, discuss the evidence, think about
the trial, and feel clear about my decision . . .

 After going back into the jury deliberation room during the punishment stage,
I recall the juror foreperson read some scripture, saying that he was comforted by the
scripture. The foreman said that we may or may not find comfort in the scripture. 
I do not recall the Chapter and verse of the scripture read. The scripture was not read
in a way to force us to agree with it. The jury was not asked to agree with the
scripture that was read or to change our decisions based upon its reading . . .

 The reading of the Bible and the comfort comment probably took less than
2 and ½ minutes out of several hours of deliberations discussing the charged law and
the facts. No other scripture was read or discussed . . . 

 I do not believe that the reading of the scripture violated the principles of
justice. In my opinion, the reading of the scripture did not violate any right of the
defendant. The scripture reading was not utilized in a way to bring prejudice against
the defendant. Moreover, in the overall scheme of about a two week trial and several
hours of deliberations, the above Bible reading was not related to the verdict returned
to the court. 


The second of the two jurors to change their vote stated:

 When the first vote was taken, I did not vote in a way in which the death
penalty was to be assessed. The negative vote was on the first of the two questions
the jury had to answer regarding a continuing threat to society. So, I initially voted
in a way that a life sentence rather than the death sentence was imposed. After going
back into the jury deliberation room during the punishment deliberations and after
the first vote, the jury foreperson read some Bible verses. The scripture was not read
in a way to force us to agree with it. The jury was not asked to agree with the
scripture that was read or to change our decisions based upon its reading or content. 
I did not feel I was going to be condemned if I did not vote for a particular verdict or
answer a question in a particular way . . . . I am today comfortable with my votes and
individual decision I made during my service on this jury. We followed the court's
instructions.

 The reading of the Bible took probably less than 2 minutes out of several
hours of deliberations discussing the charged law and facts . . . . There was no
suggestion that the Bible should be consulted on factual issues as opposed to the
evidence presented at the trial . . . . In my opinion, based upon the discussions during
jury deliberations, our decision was based upon the evidence presented during the 
course of the trial from the witness stand not on the reading of the scripture. My
individual guilt and punishment determinations were based upon the law and
evidence presented at trial not the Bible.

All twelve jurors believed that the scripture reading did not violate any right of the defendant and
that the defendant received a fair and impartial trial. The juror who read the scripture to the other
jurors stated:

 The reading of this scripture was not an attempt on my part to convince any
juror to vote in a way that would result in the death penalty. I wanted to read
scripture because of the seriousness of the decision at hand and to suggest that the
man's law as charged in the judge's instructions should be followed. There was no
suggestion that the Bible had the answer on the questions regarding whether a life
sentence or a death sentence should be imposed. There was no suggestion that the
Bible should be consulted as the legal authority contradicting the law of the court's
instructions. There was no suggestion that the Bible should be consulted on factual
issues as opposed to the evidence presented at the trial. 


All twelve jurors indicated that there was no discussion that Biblical principles should be considered
or applied in defendant's case. More specifically, Juror No. 7 addressed any misconception that may
have been construed from the affidavit previously obtained by appellant's counsel:

 The reading of the Bible and any accompanying comment probably took less
than 3 minutes out of several hours of deliberations discussing the charged law and
the facts. No other scripture was read or discussed. There was no passage read
suggesting that a murderer should be executed under Biblical law. There was no
Bible passage read about the principal of a limb for a limb or an eye for an eye or
tooth for a tooth. There was no discussion that such a Biblical principle should be
considered or applied in this case to the Defendant, Jimmie Urbano Lucero.

 There was no suggestion that the scripture reading was to convince any juror
to vote in a way that would result in the death penalty. I do not believe that the
reading of the scripture was meant to sway votes one way or the other. There was no
suggestion that the Bible had the answer on the questions regarding whether a life
sentence or a death sentence should be imposed. There was no suggestion that the
Bible should be consulted on factual issues as opposed to the evidence presented at
the trial. To my knowledge, the reading of the scripture did not cause anyone to
change their vote or to vote in a way that would have resulted in a death penalty
being imposed. In my opinion, based upon the discussions during jury deliberations,
our decision was based upon the evidence presented during the course of the trial
from the witness stand not on the reading of the scripture. From my observations, I
think each member of the jury gave his or her individual guilt and punishment
determinations based upon the law and evidence presented at trial. This was
certainly true for me.

 I do not believe that the reading of the scripture violated the principles of
justice. In my opinion, the reading of the scripture did not violate any right of the
defendant. The scripture reading was not utilized in a way to bring prejudice against
the defendant. I do not believe that there was any adverse judgment or opinion
formed regarding the answers to the questions from the reading of the scripture or its
content. I do not believe there was an detriment to the defendant caused by the
reading of the scripture. I believe that the defendant received a fair and impartial
trial. If I did not believe the defendant was accorded a fair trial, I would not be
comfortable with my votes and the jury's verdict.

 In my earlier affidavit signed through attorney Warren Clark, I did not mean
to suggest that there was a connection between the reading of the scripture or its
content and any member's ultimate vote in a way where the death penalty was
assessed. Moreover, in the overall scheme of about a two week trial and several
hours of deliberations, in my opinion, the above Bible reading was not related to the
verdict returned to the court.


 The trial court denied appellant's request for a hearing on his new trial motions. In a letter
to the parties announcing its decision, the trial court stated:

 While I recognize that "sometimes trial courts choose to wisely make a full record of
factual matters in death penalty cases", I believe that such action is contrary to the
public policy being promoted by Rule 606(b) of the Texas Rules of Evidence, in that
it would subject the jurors to the rigors of direct and cross examination regarding
their deliberations. Such public scrutiny of confidential deliberations would
discourage open discussion among jurors and could potentially be threatening to the
entire jury process.


 To conduct a hearing simply to make a record, without any expectation that the
hearing would result in admissible evidence, does not protect jurors from the
inconvenience and potential harassment that such a hearing would impose. 
Therefore, under the present circumstances, I do not believe that the Defendant has
raised an issue which would require an evidentiary hearing.[ (7)]

(Emphasis in original).

 A defendant is entitled to an evidentiary hearing on his motion for new trial if the motion
and accompanying affidavit(s) raise matters not determinable from the record, upon which the
accused could be entitled to relief. Wallace v. State, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). 
We review the trial court's decision under an abuse of discretion standard. Martinez v. State, 74
S.W.3d 19, 22 (Tex. Crim. App. 2002). Appellant claims on appeal that the trial court should have held a hearing on his new trial
motions and that the reading of Biblical scripture during the punishment-phase deliberations denied
his rights to an impartial jury and punishment determination in violation of the 6th, 8th, and 14th
Amendments to the United States Constitution. The State claims that appellant procedurally
defaulted these constitutional claims on appeal because he did not raise them in the trial court. The
State also claims that the trial court did not abuse its discretion to deny appellant's request for a
hearing on his new trial motions, because the matters described in juror No. 7's first affidavit do not
constitute an "outside influence" and would, therefore, be excluded by Rule 606(b) at a motion for
new trial hearing. (8)

 We find it unnecessary to decide whether the jury foreman's Bible reading in this case was
an "outside influence," because this record presents no "reasonable grounds" that this Bible reading
affected the jury's verdict. See Wallace v. State, 106 S.W.3d at 108 (defendant is entitled to hearing
on motion for new trial to make a record of matters not determinable from the record if the defendant
establishes the existence of "reasonable grounds" showing that the defendant "could be entitled to
relief"). The record presented to this Court indicates that this brief reading of Biblical scripture,
which was essentially an admonishment to follow man's law (and, therefore, duplicated what was
already in the court's charge), occurred near the beginning of jury deliberations. The affidavits
clearly indicate that the scripture had no effect on the jury's verdict rendered some hours later. (9) We,
therefore, cannot conclude that the trial court abused its discretion in declining to hold a hearing on
appellant's new trial motions. For the same reason, any constitutional error that appellant may have
preserved as a result of this Bible reading was harmless beyond a reasonable doubt. Points of error
one and two are overruled. (10)

 We understand appellant to claim in point of error three that the mitigating evidence
instruction "unconstitutionally narrow[ed] the jury's discretion to factors concerning only moral
blameworthiness." (11) We have previously rejected this claim. See Perry v. State, 158 S.W.3d 438,
449 (Tex. Crim. App. 2005). Point of error three is overruled. Appellant claims in point of error four that the trial court erroneously overruled his objections
to the testimony of Royce Smithee, (12) who provided fact testimony about Texas prison conditions in
general and opinion testimony that violence can occur within the Texas prison system. (13) Appellant
claimed that Smithee's testimony was irrelevant under Tex. R. Evid. 401 and, therefore, would not
aid the jury in determining a fact in issue under Tex. R. Evid. 702. The trial court ruled that Smithee
could testify generally about the operations of the Texas prison system and offer an opinion that
violence can occur there.

 [DEFENSE]: Judge, we don't believe that in this particular case-although, obviously
we would be disagreeing on different grounds if Mr. Smithee were trying to draw
directly to [appellant]. But with regard to this case, what the State's wanting to do
is to not get into the actual future dangerousness mode, but try to make an illusion
or a suggestion to the jury that because violent acts do occur in prison, that
[appellant] is going to commit that.


 If they cannot individualize and show evidence particular to [appellant's] probability
to commit future acts of violence in the future, then the evidence is not relevant.


 That's what their burden is-and that's what this gentleman will have to
prove-showing the prison system is fine unless they're going to try to go into the fact
that violence can occur in prison. But he can't give us any handle or any help as to
whether or not this particular Defendant would be a violent risk in the future, so we
believe it's not relevant under 702 and we would ask the Court to exclude him.


 [THE COURT]: The objection as to relevance will be overruled.


 Counsel, Mr. Smithee will be allowed to give factual testimony about the operations
of the Institutional Division of the Texas Department of Criminal Justice, and I don't
believe an opinion is necessary in any area.


 [STATE]: I think, Your Honor, as far as opinion goes, the furtherest (sic) that he
would be asking Mr. Smithee questions in that regard was if any inmate chose to
commit an offense within the prison system, could they within the system as it's set
up today, do that if they chose to do so. But we are not going to be applying that
directly as to he just begs our question on that.


 [DEFENSE]: I don't believe there's any question that an inmate could do that if they
wanted to, you know, whether it be with their hands or otherwise. But they're trying
to draw a parallel between this Defendant and general suggestions that they're going
to say and they just simply can't do that. But they want to try to throw that out in
front of the jury, so we believe that again-we're not trying to argue with the Court,
I apologize, but that it should not be admissible.


 [THE COURT]: Okay. The objection will be overruled.


 Mr. Smithee will be entitled to give opinion testimony as to whether or not violence
can occur within the system, and factual testimony about the operations of the Texas
Department of Criminal Justice, Institutional Division, but would prohibit opinion
testimony as to probability or any kind of specific percentages.


 The record also reflects that, as part of its case at punishment, the defense claimed that "in
an incarcerated setting, [appellant] is not going to be a problem" and that a life-sentenced appellant
"would do well in prison." In addition to presenting Smithee's testimony that violence can occur
within the Texas prison system, (14) the State also presented evidence that appellant had a "pattern of
violence that stretche[d] back for 20 years." This evidence included numerous assaults that appellant
committed during this period of time against various people, including members of his own family,
with some of these assaults involving firearms.

 An issue for the jury's determination was appellant's future dangerousness. See Article
37.071(b)(1), Tex. Code Crim. Proc. The trial court did not abuse its discretion to decide that
Smithee's testimony that inmate violence can occur under current prison conditions had some
relevance to, and would have aided the jury in determining, appellant's future dangerousness, such
as considering whether a life-sentenced appellant, with his history of assaultive behavior, would have
opportunities to commit violent acts in prison. See Threadgill v. State, 146 S.W.3d 654, 670-71
(Tex. Crim. App. 2004) (trial court did not abuse its discretion to admit photographs of bombs and
weapons made by inmates in Texas prison system because "evidence regarding weapons made by
prison inmates was at least marginally relevant to the testimony concerning inmate violence within
various classifications of prison society"); Canales v. State, 98 S.W.3d 690, 699 (Tex. Crim. App.
2003) (testimony regarding inmates' ability to defeat locking mechanisms on prison cell doors
relevant to future dangerousness special issue).

 Appellant also claims on appeal that the admission into evidence of Smithee's testimony
violated his Eighth Amendment right to individualized sentencing. The record, however, reflects
that appellant did not present this Eighth Amendment claim to the trial court. He, therefore, failed
to preserve this Eighth Amendment claim for appellate review. See Tex. R. App. Proc. 33.1(a)(1). 
Point of error four is overruled.

 In point of error five, appellant claims that the State delivered improper jury argument at the
punishment phase. (15) The record reflects that appellant's brother testified at the punishment phase
that appellant broke into his home in February 1995. Appellant was indicted for burglary as a result
of this incident. Appellant's brother testified that he told a police officer the day after the incident
that he did not want to press charges and that he later signed "a form with the District Attorney's
office asking them to not prosecute" appellant.

 Q. [STATE]: Okay. Now, let's talk about since that day. You told the police officer
that night or that next day that you did not want to press charges against [appellant]?


 A. [APPELLANT'S BROTHER]: Yes.


 Q. And they did press charges against him, correct?


 A. Correct.


 Q. And later on, just a month or two later, basically, you changed your mind on that,
didn't you, or you made a request of them. Is that a fair statement?


 A. I believe so.


 Q. What was that request?


 A. I didn't want him to pay for any of the damages or anything like that.


 Q. Did you also sign a form with the District Attorney's office asking them to not
prosecute him?


 A. I believe I did.


 Q. What was your purpose in doing that?


 A. I love him and respect him.


 Appellant eventually received two years deferred-adjudication community supervision for
that burglary offense pursuant to a plea bargain. During closing arguments, the State argued, over
appellant's objection:

 [STATE]: Mitigating evidence. You want to talk about that a little bit and we will
for awhile. But right now, I want to particularly call your attention to one particular
thing that they kept saying. You know, he's sorry, he's nice, he's a wonderful guy.


 Guess what, folks? I submit to you that's the exact same thing he told the
prosecutors back in 1995 and he got off light. He got a break because his family
wanted him to have a break. And, Lord, help us, look where we are now. Because
I'm sure that prosecutor thought long and hard about what to do because of the facts
of the case-


 [DEFENSE]: Judge, I'm going to object to that, that's inviting the jury to speculate
outside the record.


 [THE COURT]: The objection will be overruled.


 [STATE]: -about the facts of that case, as well as the considerations that that family
asked for leniency for their brother so he wouldn't have to testify. And they won the
day and look where we are. You cannot allow them to win the day again. If you do,
to whom and for what will we have to allow [appellant] to apologize for again?


 Appellant claims that the State's "reference to facts suggesting that Appellant and his family
took pains to influence the prosecution was not inferable from the evidence and as such, was wholly
improper" by injecting into the trial "new facts harmful to Appellant." We decide that the State's
argument was a reasonable deduction from brother Robert's testimony that he told a police officer
that he did not want to press charges and that he believed that he later signed a form with the District
Attorney's office not to prosecute appellant. See Holberg v. State, 38 S.W.3d 137, 141 (Tex. Crim.
App. 2000) (a permissible area of jury argument is reasonable deduction from the evidence).

 In addition, any error in the overruling of appellant's objection to the State's argument was
harmless, because, on this record, any unsupported-by-the-record assertion that appellant's family
may have influenced the authorities to show leniency on appellant in the 1995 burglary case had
little, if any, influence on the jury's answers to the special issues. See Johnson v. State, 967 S.W.2d
410, 417 (Tex. Crim. App. 1998) (non-constitutional error is harmless when "the appellate court,
after examining the record as a whole, has fair assurance that the error did not influence the jury, or
had but a slight affect."). We believe that the jury's answers to the special issues turned primarily
on the facts of the offense (the brutal murder of three neighbors in their home for no apparent reason)
and appellant's history of assaultive conduct. We do not believe that the jury's answers to the
special issues resulting in appellant's death sentence hinged on any efforts by appellant's family to
persuade the authorities to show leniency on appellant in the 1995 burglary case. See id. Point of
error five is overruled.

 We understand appellant to claim in point of error six that the trial court erroneously denied
his request for a mistrial. He claims that he was entitled to a mistrial when the State's punishment-phase closing jury arguments directly commented on appellant's failure to take the stand at the
punishment hearing to express remorse for murdering his three neighbors. (16)

 The record reflects that appellant presented the testimony of a psychological expert
(Schneider) whose testimony was based, in large part, on statements appellant made to him during
a psychological evaluation after appellant committed the offense in this case. Schneider's written
psychological evaluation of appellant was also introduced into evidence as Defense exhibit 1. 
Among other things, Schneider's written psychological evaluation of appellant concluded that
"[p]ersonality assessment suggests [appellant] to be chronically depressed and to experience intense
suspicion of others, to maintain a strict guardedness and distance from others and to feel some
relative comfort only in solitary conditions."

 Schneider testified consistently with his written psychological evaluation of appellant and
also testified generally about "sociopathic behavior," with one of its indicators being "very little
remorse." Schneider also testified that, with "the limited information" he had, he could not say
"definitively" that appellant was "sociopathic." (17) He also testified regarding appellant's demeanor
during the evaluation, particularly "in specific reference" to this capital murder offense.

 Q. [DEFENSE]: What was his demeanor when he was talking with you on all these
issues?


 A. [SCHNEIDER]: He was-he became-in specific reference to that incident, he
became very quiet, very reserved, very guarded. I tried to, kindly as possible, get as
much information as possible, but he became tearful and he just chose not to talk
about it.


 This was consistent with Schneider's written psychological evaluation of appellant, which
stated:

 Regarding the incident(s) in question, Mr. Lucero was asked if he remembered the
incident(s). He stated, "Yes." When asked to describe what led up to the incident
in question, Mr. Lucero became tearful and chose not to discuss the actual incident. 
He stated that it occurred in September 2003, that he was home "just by myself." 
When asked what occurred on that day, he stated, "I just don't want to talk about it." 
The subject became withdrawn, tearful and unresponsive to any type of inquiry. The
interview was completed at that point.


 We understand appellant to have claimed, during the State's closing jury arguments, that the
following emphasized portion of the State's jury argument could only have been understood by the
jury as a comment on appellant's failure to take the stand to express remorse:

 [STATE]: He's a good killer. He slaughtered and massacred the heart of the Robledo
family in less than 2 minutes. He killed Pedro, Manuela and Fabiana, shot at
Soccorro, and but, for I'll submit to you, the grace of God, for Guadalupe to be
turned sideways so that the shot went through her arm before it struck her body, or
she would be dead, also. And she was fortunate enough not to cut a major artery in
her arm and she still nearly died.


 This Defendant did all that in the presence of an 18-month-old boy, who now fears
sirens, fears police, fears ambulances; and those are the folks he's supposed to trust
and believe in. Will he ever get over that? Who knows?


 The thing we do know is he will have to live with it for the rest of his life. We don't
know whether he's concerned about it at all, folks. (18) We really don't-


 [DEFENSE]: Judge, I'm going to object-may we approach the bench?


 (On-the-record conference had at Bench:)


 [DEFENSE]: Judge, that last comment was an overt comment on the failure of the
Defendant to testify and we would object.


 [THE COURT]: The objection will be sustained.


 [DEFENSE]: We would ask for an instruction to the jury to disregard that, and after
that instruction, we would move for a mistrial.


 [THE COURT]: The motion for a mistrial will be denied. I will give you an
instruction about the comment.


 [DEFENSE]: Thank you, Judge.


 (Proceedings had in open court)


 [THE COURT]: Ladies and gentlemen, I will instruct you to disregard any comments
or arguments by the Prosecution as to whether or not the Defendant is concerned and
I'll leave it at that.


 Mr. Sims.


 [STATE]: From the evidence submitted to you by their witnesses, there's no
evidence of that. That's what I'm telling you, folks. There's no evidence of that, just
like there's no evidence of remorse. There's no evidence that what transpired and
what will transpire in prison that he will try to do anything to help any of those
inmates.


 He's controlling. He's jealous. He's manipulative. He's impulsive. He's irritable. 
He's aggressive. He's reckless, with a disregard for the safety of others. He has
irresponsible work behavior. And he shows little remorse.


(Emphasis supplied).

 On this record, it is not clear that the jury would have naturally understood the State's
argument that "[w]e don't know whether [appellant's] concerned about it at all, folks" as referring
to appellant's failure to take the stand at punishment to express remorse. See Ladd v. State, 3
S.W.3d 547, 569 (Tex. Crim. App. 1999) (State's jury argument commenting on defendant's lack
of remorse could have been interpreted by jury as referring to testimony of psychiatrist, who testified
that defendant was a sociopath and had no remorse for his crimes). (19) To the extent that the State's
argument could have been so construed by the jury, appellant was not entitled to a mistrial, because
the trial court's instruction to disregard was sufficient to cure any prejudice stemming from the
State's argument. See Young v. State, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) (grant of mistrial
motion should be reserved for those cases in which an objection could not have prevented, and an
instruction to disregard could not have cured, the prejudice stemming from an event at trial);
Caldwell v. State, 818 S.W.2d 790, 799-800 (Tex. Crim. App. 1991) (20) (any improper jury argument
by State alluding to defendant's lack of remorse was cured by trial court's instruction to disregard). (21) 
In addition, appellant failed to object to the State's subsequent jury arguments that "there's no
evidence of remorse" and that appellant "shows little remorse." Appellant, therefore, is not entitled
to a reversal due to the State's earlier objected-to reference to appellant's lack of remorse. Cf. Leday
v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (overruling of objection to evidence will not
result in reversal when other such evidence was received without objection, either before or after the
complained-of ruling).

 In point of error seven, appellant appears to argue that Article 37.071, Tex. Code Crim.
Proc., is unconstitutional because it fails "to provide a method by which the State of Texas
determines the deathworthiness of a capital defendant." (22) Appellant relies primarily on the Supreme
Court's decision in Bush v. Gore, 531 U.S. 98 (2000). We have rejected the arguments that appellant
appears to present in this point of error. See Threadgill v. State, 146 S.W.3d at 671-72 (rejecting
defendant's argument that "because Article 37.071 fails to provide a mechanism by which the State
determines the death worthiness of the Defendant, it does not provide 'some assurance that the
rudimentary requirements of equal treatment and fundamental fairness are satisfied'"). Point of error
seven is overruled.

 The judgment of the trial court is affirmed.

 Hervey, J.


Delivered: February 13, 2008

Publish
1. On the morning of September 6, 2003, the 45-year-old appellant entered his neighbor's
property and murdered three members of the Robledo family with a shotgun. Pedro Robledo, his
wife, Manuela Robledo, and their daughter Fabiana Robledo were murdered. Appellant also
attempted to murder the Robledo's other two children, Socorro and Guadalupe Robledo, who both
testified at trial. Socorro testified that he escaped on foot without injury, and Guadalupe testified
that appellant cornered her, Fabiana, and Fabiana's 18-month old son in a bedroom. Appellant shot
Guadalupe in the arm and murdered Fabiana after pulling her son from her arms.
2. Point of error one: Did the trial court abuse its discretion and commit reversible error in
denying appellant an evidentiary hearing on the issue of scripture reading by the jury foreman during
punishment deliberations?
3. Point of error two: Was appellant denied his rights to an impartial jury and punishment
determination in violation of the Sixth, Eighth, and Fourteenth Amendments to the Unites States
Constitution when jurors considered Biblical scripture during its deliberations at the punishment
phase of appellant's trial and before it rendered its final verdict?
4. The record reflects that the jury foreman read Romans 13:1-6, from the New Testament of
the New International Version of the Bible. Romans 13:1-6, provides:


 [1]Everyone must submit himself to the governing authorities, for there is no authority
except that which God has established. The authorities that exist have been
established by God. [2]Consequently, he who rebels against the authority is rebelling
against what God has instituted, and those who do so will bring judgment on
themselves. [3]For rulers hold no terror for those who do right, but for those who do
wrong. Do you want to be free from fear of the one in authority? Then do what is
right and he will commend you. [4]For he is God's servant to do you good. But if you
do wrong, be afraid, for he does not bear the sword for nothing. He is God's servant,
an agent of wrath to bring punishment on the wrongdoer. [5]Therefore, it is necessary
to submit to the authorities, not only because of possible punishment but also because
of conscience. [6]This is also why you pay taxes, for the authorities are God's servants,
who give their full time to governing. 
5. Appellant claims on appeal that the Biblical scripture read by the foreman "had to do with
a Christian's duty and responsibility to carry out the dictates of secular law" which "includes
society's and this state's validation of the legality of capital punishment." He further asserts that:


 [T]his extra-judicial code of law requires a mortal's submission to civil law and that
includes the imposition of capital punishment. In this regard, reference to Romans
13:1-6 carries with it a high potential of influencing a jury's deliberations on the
issue of life or death.
6. Rule 606(b) provides:


 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify
as to any matter or statement occurring during the jury's deliberations, or to the effect
of anything on any juror's mind or emotions or mental processes, as influencing any
juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit
or any statement by a juror concerning any matter about which the juror would be
precluded from testifying be admitted in evidence for any of these purposes. 
However, a juror may testify: (1) whether any outside influence was improperly
brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified
to serve. 
7. This is consistent with the rationale that has been expressed for the general rule of not
permitting a juror to impeach his own verdict. See State ex. rel. Rosenthal v. Poe, 98 S.W.3d 194,
202 (Tex. Crim. App. 2003). For example, even in a case where a juror's affidavit indicated that the
jury may have "adopted an unjust and arbitrary method" of arriving at its verdict, the United States
Supreme Court stated:


 The rule [that a juror cannot impeach his own verdict] is based upon controlling
considerations of a public policy which in these cases chooses the lesser of two evils. 
When the affidavit of a juror, as to the misconduct of himself or the other members
of the jury, is made the basis of a motion for a new trial, the court must choose
between redressing the injury of the private litigant and inflicting the public injury
which would result if jurors were permitted to testify as to what had happened in the
jury room.


 These two conflicting considerations are illustrated in the present case. If the facts
were as stated in the affidavit, the jury adopted an arbitrary and unjust method in
arriving at their verdict, and the defendant ought to have had relief, if the facts could
have been proved by witnesses who were competent to testify in a proceeding to set
aside the verdict. But let it once be established that verdicts solemnly made and
publicly returned into court can be attacked and set aside on the testimony of those
who took part in their publication and all verdicts could be, and many would be,
followed by an inquiry in the hope of discovering something which might invalidate
the finding. Jurors would be harassed and beset by the defeated party in an effort to
secure from them evidence of facts which might establish misconduct sufficient to
set aside a verdict. If evidence thus secured could be thus used, the result would be
to make what was intended to be a private deliberation, the constant subject of public
investigation; to the destruction of all frankness and freedom of discussion and
conference.


See McDonald v. Pless, 238 U.S. 264, 267-68 (1915).
8. The State argues that "a juror's affidavit that described matters that did not constitute an
'outside influence' could not be used to support a live hearing on a motion for new trial based on
jury misconduct."
9. The record indicates that jury deliberations began at 12:20 pm and ended at 5:19 pm. The
record also indicates that the scripture was read near the beginning of the deliberations, thus the jury
deliberated for many hours after the scripture was read and before they rendered a final verdict.
10. We also note the Ninth Circuit Court of Appeals' decision in Fields v. Brown, a state of
California death-penalty case in which the jury foreman made notes "for" and "against" imposition
of the death penalty after consulting the Bible and other texts. See Fields v. Brown, 503 F.3d 755,
776-82, 780 (9th Cir. 2007). The "for" notes included a reference to Romans 13:1-6, and to other
Biblical scripture such as an "eye for an eye" and Exodus 21:12, which states, "He that smiteth a
man, so that he dies, shall surely be put to death." See id. The jury foreman's "for" and "against"
notes were shared with other jurors during punishment deliberations. See id.

 The defendant presented a "number of juror declarations" to the federal district court in
support of his claim that the references to the Bible and other texts during jury deliberations in the
state court proceedings constituted jury misconduct. See id. The federal district court and the Ninth
Circuit analyzed this claim under Federal Rule 606(b), which is more expansive than Texas Rule
606(b), because Federal Rule 606(b) permits jurors to testify "whether extraneous prejudicial
information was brought to the jury's attention." See Fields, 503 F.3d at 776-83.

 The federal district court struck most of the juror declarations as being inadmissible under
Federal Rule 606(b). See Fields, 503 F.3d at 778. Based on what was left, the federal district court
found "that the religious material in the [foreman's] notes was actually received by the jury, was
available to it on the second day of deliberations, was discussed by some jurors, was presented at an
early stage of deliberations before a verdict was reached, and directly related to a material aspect of
the case because the references indicated that the death penalty should be imposed in any case
involving murder." See id. The federal district court concluded that "the jury's consideration of
Biblical references offended the principle that religion may not play a role in the sentencing process,
and that it had the potential to be highly prejudicial." See id.

 In suggesting that the jury could properly consider the jury foreman's "for" and "against"
notes, the Ninth Circuit stated that "the Biblical verses and the other concepts contained in the notes
are notions of general currency that inform the moral judgment that capital-case jurors are called
upon to make." See Fields, 503 F.3d at 780. The Ninth Circuit ultimately decided, however, that
the jury foreman's notes were harmless, because they did not have a "substantial and injurious
effect" on the jury's verdict. See Fields, 503 F.3d at 781-82. The Court stated:


 Whether or not [the jury foreman] should have brought his notes to the jury room and
shared them, we cannot say that the Biblical part of the "for" part of the notes had a
substantial and injurious effect on the verdict. His own notes had an "against" part
as well. So far as we can tell, the communication occurred early on in the
deliberations. Jurors could take as much time as they needed to sort through the
evidence and reflect on whether the ultimate penalty was the right penalty. More
importantly, the jury was instructed to base its decision on the facts and the law as
stated by the judge, regardless of whether a juror agreed with it. We presume that
jurors follow the instructions.


See id. (Footnote and citations to authority omitted).
11. Our understanding of the claim presented in appellant's third point of error is based on
appellant's reference in his brief to his amended motion for new trial, which presented this specific
claim to the trial court for the first time. The question appellant presents in point of error three is:


 Does Art. 37.071 sec. 2(f)(4) Code of Criminal Procedure violate the 5th, 6th, 8th and
14th Amendments to the United States Constitution as well as those principles
underlying Tennard v. Dretke, 542 U.S. 274, 124 S.Ct. 2562 (2004)? 
12. Smithee is the "chief investigator for the Special Prosecution Unit," which is a "prosecutor
assistance program out of the governor's office" with the primary function "to investigate and
prosecute, help the DA prosecute, criminal offenses that occur in the prison system and/or on state
property."
13. The question appellant presents in point of error four is:


 Did the trial court abuse its discretion in admitting Smithee's testimony concerning
violence in prison and the inner workings of prison when the witness could not and
did not opine that the circumstances, facts and events described by Smithee would
specifically apply to Appellant in his situation?
14. For example, Smithee testified that a "defendant" within "the prison system" can be "as
violent as he wants to be when that opportunity arises."


 Q. [STATE]: Is your testimony limited just to the fact that if a defendant chooses to
exercise his choice and commit a violent crime within the prison system, is it your
testimony that he will have the opportunity to do that?


 A. [SMITHEE]: An individual can be as violent as he wants to be when that
opportunity arises.
15. The question appellant presents in point of error five is:


 Was the prosecutor's assertion that Appellant's and his family's influence in
persuading the prosecuting authorities to extend leniency for Appellant's
involvement in a burglary of a family member's residence so prejudicial that it had
a substantial and injurious effect or influence in determining the jury's answers to the
special issues and therefore, affected Appellant's substantial right to a fair trial?
16. The question appellant presents in point of error six is:


 Did the trial court commit reversible error in failing to grant a mistrial as a result of
the prosecutor's direct comment that Appellant had somehow neglected to
demonstrate consideration or remorse for the crime of which he was convicted?
17. Schneider also testified on cross-examination that sociopaths "show little remorse."


 Q. [STATE]: Let's talk a minute about antisocial personality disorder. Can you give
me some criteria for that, sir-well, let me ask you, would the criteria include failure
to conform with social norms?


 A. [SCHNEIDER]: Yes.

* * *


 Q. And those that show little remorse?


 A. Yes.
18. The record, therefore, does not necessarily support the assertion that the State's jury
argument was a reference to appellant's lack of remorse. The State's jury argument that "[w]e don't
know whether [appellant's] concerned about it at all, folks" was consistent with Schneider's
testimony and his written evaluation setting out appellant's statement, "I just don't want to talk about
it." 
19. Arguably, on this record, it would have been permissible for the State to have commented
on appellant's lack of expression of remorse during his evaluation by Schneider, because such a
comment is supported by the record and is encompassed within Schneider's evaluation of appellant,
particularly whether appellant has indicators or characteristics of a sociopath. Compare Renteria
v. State, 206 S.W.3d 689, 697 fn.4 (Tex. Crim. App. 2006) (prosecutorial unsupported-by-the record
comment on defendant's lack of expression of remorse may be impermissible comment on
defendant's failure to testify). The jury, therefore, could have manifestly and naturally understood
the State's argument as a permissible reference to appellant's lack of expression of remorse during
his evaluation by Schneider and not as an impermissible reference to appellant's failure to take the
stand at the punishment hearing to express remorse. See Cruz v. State, 225 S.W.2d 546, 548 (Tex.
Crim. App. 2007) (test to determine whether prosecutorial argument is comment on a defendant's
failure to testify "is whether the language used was manifestly intended or was of such a character
that the jury would necessarily and naturally take it as a comment on the defendant's failure to
testify") (quoting Bustamonte v. State, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001)).
20. Overruled on other grounds by Castillo v. State, 913 S.W.2d 529, 532-35 (Tex. Crim. App.
1995).
21. Appellant claims on appeal that the trial court's instruction to disregard was "tepid" and
"not forceful enough to cure the error." The record, however, reflects that appellant made no such
claim at trial. In addition, appellant's argument that the trial court's instruction to disregard "was
not forceful enough to cure the error" effectively concedes that any prejudice in the argument was
curable by an instruction to disregard. 
22. The question appellant presents in point of error seven is:


 Does Art. 37.071 of the Texas Code of Criminal Procedure fail to provide a method
by which the State of Texas determines the deathworthiness of a capital defendant,
thereby eliminating consistency in the decision to seek the death penalty and
weakening the degree of accuracy required in imposing death, in contravention of the
Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution?